Our next case is Ward Participations B.V. v. Samsung Electronics Co., Ltd., docket number 23-2080. Mr. Lund, you reserve four minutes of your time for rebuttal, correct? Yes, Your Honor. Okay. I think we're ready. May it please the Court, Eric Lund for Appellant Ward Participations, and I'm joined by Mr. Joseph Zito. It's important to start with the invention of the Ward patents, and I want to start with figure three of the 480 patent, which is at Appendix 140. What Mr. Ward invented here is a software solution to doing secure transactions, and the way that Mr. Ward did this was he identified that typically when a user is using a system, they're going through the operating system. That creates a vulnerability in the system because if that gets compromised, typically the operating system has direct access to what we call the secure area. You're waving a document. Is that in the record? This is figure three. We can't see that anyways. Okay. Well, then I'll keep it for my notes. So looking at figure three, on the left side is what I'm talking about where in a typical system, a user is making transactions, and that operating system has access to the secure area. What Mr. Ward recognized was that there's a way to separate out so that the operating system does not have access to the secure area, and the solution that he came up with is whereby, as you see on the right side here, figure three, for the user or the operating system to get to the secure area, it has to go through the BIOS, which has the encryption key, and it has to go, importantly, through the console. The key here is that Mr. Ward recognized that although the console was typically used for error processing, in this it could be used to access and to run the secure processing environment, and that's key to remember because when the board has combined two references in particular, Muir and Ellison, these are two references that did not recognize that problem and that don't have that solution. In Muir, I'm looking at figure three, which is 1008 in the appendix. The board relies on the virtual smart card driver of figure three of Muir to teach the secure transaction in accessing a secure environment. Nothing in Muir talks about a secure environment. It all is being processed in an open general processing environment that's accessible to the operating system and to a user of the operating system. The board then takes Muir, which is unsecure, and puts it into Ellison. If we look at figure 1A of Ellison, which is appendix 949, Ellison is divided into two different architectures, a normal execution and an isolated execution. If we look at the normal execution, which is unshaded, we see that the software driver 13 and the hardware driver 14 reside on the normal execution mode. In that same mode is the primary OS, which Mr. Ward identified as a vulnerability. The board has stated that you would combine these two systems, but the only way to combine Muir with Ellison is to put that virtual card smart driver 155 where Ellison teaches the drivers reside, which is in the normal execution environment. That is not the invention of Mr. Ward, because in this system you're going to have all of the applications running, all of the operating system, and all of the drivers on the normal execution mode, which does not solve the problem. Coming back to Mr. Ward's, you're still on the left side where the operating system and the user has access to the secure environment. Nothing in Ellison teaches putting the Muir system on the shaded side in the isolated environment. Neither Muir nor Ellison teach using the console as the access point for the secure environment. Counselor, I appreciate your arguments. Can you touch on the construction, the clean construction argument of stored and set secure memory inaccessible to set operation system? Yes, Your Honor. On that point, our position was that when the processing is loaded into the processing environment, although it may go into a secure processing area, it is normally stored in an unsecure area. The board made a distinction there that even a temporal storage or temporal moment in a processing environment is enough to satisfy the secure element. Now, even with that construction that the board has gone through, our position is still that combining these two systems, you have an unrecognized problem that these two don't recognize, even if we adopt the board's construction of whether something is secure, whether it's temporally stored or not. And the reason for that is because when you combine these two systems, you're going to be running these drivers through the normal execution mode. You're back at combination. I was hoping you could address the clean construction issue. It seems to me that you're arguing that the board erred in construing the particular claim that I recited. Yes, Your Honor, that is our position. Can you address that issue? Yes. On that point, our position is that if the driver is or any component is stored in an unsecure area, then it is accessible to an intruder. It is accessible to someone who gets access to the operating system or to the general hardware of the system. The board's position is that even a temporal moment where it's loaded into a secure position would satisfy the claim limitation. And obviously, we disagree with that. But we do understand that when things are temporally stored, whether it's in a secure area or an unsecured area, Would you agree with me that your arguments with respect to claim construction are mainly factual assertions? They're based on facts? Yes, Your Honor. And they're claim constructions that, from our position, we've put forth testimony from one of Ordinary School in the Art that they would see it a different way. The board has chosen to interpret a different way, and we understand that. But yes, Your Honor, I would agree. Did you brief this as a claim construction dispute to the board and or to us? Yes, Your Honor. We did brief the claim construction issue at the board. In our opening brief, I believe we mentioned it. How about here? Are you arguing? I'm not arguing claim construction today. No, Your Honor. You have a couple of sentences that's in the midst of a very, very large chunk mostly about the Art that sounded like a claim construction argument, but you're not really pressing that. No, I'm not pressing claim construction, Your Honor. And the reason I'm not pressing it today is because we believe that the most salient point, which you can decide everything notwithstanding the claim construction, is this combination of the Art, which we believe does not recognize the problem that the board solved and does not teach it, even when combined. But those are factual arguments that the board considered, and we review the board's findings for substantial evidence, correct? Yes. Is the same true with the arguments with respect to obviousness and combination? Those are factual assertions that you're making. Well, Your Honor, obviousness, the interpretation of the board, we believe on those combinations is wrong. We think that's against the weight of the evidence because even assuming that these two references would have been combined by one of ordinary skill in the Art and that they would look to Muir to solve this problem with Ellison, we don't believe that the references show the solution. And we've argued that. We made this point in 1606 in our opening brief in the appendix. And our position today is that the combination of these elements doesn't teach Mr. Ward's invention and that the board has erred by concluding that they're there. The board specifically, they looked at these arguments and they made a determination that we believe is contrary to the evidence and is not supported by the disclosures themselves and what one of ordinary skill in the Art would have come up with in combining these. Can you say a word about the written description point, which if the board is right about, applies to all the claims in the 480? Yes, Your Honor. Thank you. And we did brief that, page 53 of our opening brief where we talk about that extensively, but I do want to make two points. The first is that the written description as understood by one of ordinary skill in the Art points to the fact that substituting authentication data for private key was appropriate. We have testimony from our world-renowned expert, Dr. Purnell, on that point. But the one thing I do want to highlight is that when the board interpreted the 112 issue, they took issue with the fact that our disclosure talks about two different, what they believe are two different private keys. Well, in encryption, there's both symmetric encryption and asymmetric encryption. The board only addressed asymmetric encryption where you have both a public key and a private key, two keys, one for signage and one for encryption. Our system can be an asymmetric system, wherein the private key can be both for encryption and for signage. And so the point... It can be a symmetric system. Symmetric system, yes. I misspoke, yes. My apologies. It can be a symmetric system whereby the same key can be used both for encryption and signage. And the reason we point that out is because the reasoning whereby the board looked at our disclosure and said, you have two distinct keys here, and used that as a reason to not take one interpretation over the other. But that's because they were thinking about an asymmetric system, not a symmetric system where those keys could serve both functions. And if there's no further questions, I'll reserve my time. Okay. Thank you, sir. Thank you. Counselor Bolt. Good morning, Your Honors. May it please the Court. Ashley Bolt for Samsung. As Your Honors recognized in talking to Ward's counsel, this appeal is all about disagreements with the board's fact findings. And as you know well, reweighing evidence on appeal is not the role of this court. So in the three proceedings below, the board found the disputed claims would have been obvious based on the Ellison and Muir references. And the board's findings with respect to the teachings of those references… I'm sorry, not all. In the two IPRs. Correct. All of the other 480 claims are at issue in the PGR. That's right, Your Honor. So the claims disputed with respect to the 103 grounds were all found unpatentable based on the combination of the Ellison and Muir references. And as counsel for Ward brought up, the board found that there was a motivation to combine those references. And whether a person of ordinary skill in the art would have been motivated to combine those references is a question of fact that this court reviews for substantial evidence. Well, one way of understanding Mr. Lund's argument might be that somebody might be motivated to combine, but the combination would not arrive at the claims. Because if you take the virtual something driver in Muir and put it in the relevant place in Ellison, it's actually going to be on the daytime side of this sphere and not the nighttime side. Certainly, an apt description. But, Your Honor, what we would say to that is that the board relied on expert testimony from Samsung's expert, Dr. Black, that a person of ordinary skill in the art could combine these references, and that constitutes substantial evidence to support the board's findings. Just because they could? I mean, we've said repeatedly the fact that something could be combined is not sufficient by itself. You need a reason why a skilled artisan would combine them. I misspoken that I think it might be helpful for us to look at the expert testimony that supports the board in this regard. So, for example, we could look at appendix page 12, 17. And at paragraph 71 on page 12, 17, we're looking at Dr. Black's declaration submitted to the board. I see your honors are still flipping. Are you there? Okay. So, this paragraph sort of concludes Dr. Black's reasoning with respect to the motivation to combine. And he says, for at least the foregoing reasons a person of ordinary skill in the art would have combined the teachings of Ellison and Muir, and would have had a reasonable expectation of success, that the combination would have simply involved combining prior art elements, Muir's computer system with restricted memory space, and secure cryptographic operations, according to known methods, using Ellison's isolated execution architecture, to yield the predictable result of performing electronic transactions securely between two parties. So, Mr. Bunn said the two pieces of prior art do not show recognition of the problem. Is your view that, so what, it doesn't matter, or that he's wrong about the absence of a recognition of the problem? I don't believe we have taken a position as to whether the references recognize the problem, but I think that our position is that, as you said, so what, it doesn't matter, because we have substantial evidence supporting the board's findings that a person of ordinary skill in the art would have combined the references, would have had a reasonable expectation of success in doing so. And that that testimony, even standing alone, is enough to constitute substantial evidence to support the board's findings. If there are further questions on the obviousness issue, I'd be happy to address those. Okay, so I'd like to just briefly touch on the written description issue. So, in the PGR covering the 480 patent, the board found all claims of the patent unpatentable because they lack written description support for certain limitations reciting a private key. This finding is also supported by substantial evidence. There's only one paragraph in the 480 patent specification that mentions a private key, but as the board recognized, that paragraph in column 13 does not describe, for example, where that key is stored, when it's accessible to the user, or when it is encrypted. And those are all limitations of the claim that must be supported by a written description in the patent. So Mr. Lund said something to the effect, and I may get this wrong, that the spec refers to two different private keys. And the board assumed that those were different private keys, so that although it may say something about the place of storage of one of them, it doesn't say anything about the place of storage of the other. And I think Mr. Lund said, well, one of the two standard ways of doing encryption is to use the same key. Can you just address that?  So if we look at the 480 patent at, I believe it's column 5, starting around line 39, there is a paragraph that talks about the authentication software that has its own unique serial number, software ID, and or private encryption key. That phrase private encryption key is, I believe, the other key to which Mr. Lund was referring in his argument. And certainly the specification does describe the encryption key in that way. But when we turn then to column 13, which is the only place in which the specification uses the specific term private key, we see that, for example, we have at the beginning of that paragraph around line 31. I'm sorry, just to be clear, you say that's the only place that it uses the phrase private key, even though the passage at column 5, line 40, uses the pretty similar phrase private encryption key? Yes, Your Honor. Okay. Our position is that those are two different keys, two different terms. And that's supported by, in column 13, for example, around line 31, when we get to this paragraph talking about the private key, the paragraph starts with, in a further embodiment, the authentication software may be provided with, and then goes on to talk about the private key, suggesting that it's a different key. And, Your Honor, it's actually further supported by the related patent, the 766 patent here. If we look at claim 1 of the 766 patent also recites a private key, as does claim 1 of the 480 patent. But then the claim 24 of the 766 patent, which depends from claim 1, recites the method according to claim 1, wherein the authentication software has a private encryption key. So the difference in claiming in this related patent, the 766 patent, suggests that the private key and the private encryption key are two different things. I'm sorry, this was claim 1 of the 766? Claim 24. Thanks. Your Honors, if there are further questions with respect to written description, I'd be happy to take those at this time. If not, I will cede the remainder of my time, and Samsung asks that this Court affirm. We thank you very much, Counselor. Thank you. Mr. Lewin, you have four minutes. Thank you, Your Honor. I'll start. If the Board has any questions, I can address those based on what Counsel said. If not, the final point I just want to make is that we're not here disputing facts. The references themselves are facts. We're disputing the legal conclusions that the Board came up based on those facts, and we're disputing the opinion of Samsung's expert, Mr. Black. And for that reason, Mr. Ward asks that the Board reverse – or the panel reverse. Thank you. Okay, we have your argument. Thank you, sir.